UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| PERRI L. IRMER, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 13-cv-2834 |
| v. | ) | |
| | ) | Judge John W. Darrah |
| JERRY M. REINSDORF and | ) | |
| JAMES R. THOMPSON, | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Perri Irmer has brought this action against Defendants, Jerry M. Reinsdorf and James R. Thompson, for causing the termination of her former employment as the Executive Director and Chief Executive Officer of the Illinois Sports Facilities Authority ("ISFA"). Defendants have moved, separately, to dismiss Irmer's Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6). Irmer has also moved to strike the exhibits attached to Reinsdorf's Motion.

## **BACKGROUND**

The following is taken from the Complaint, which is assumed to be true for purposes of a motion to dismiss. *See Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010). The ISFA is a unit of local government created by the Illinois General Assembly, whose purpose is to use public funds for the provision of sports stadiums in Illinois. (Compl. ¶ 10(a)). Its principal asset is U.S. Cellular Field, and the relationship between the ISFA and the White Sox is governed by a Management Agreement that runs through 2029. (*Id.* ¶¶ 11-12.) Under that agreement, the White Sox have enjoyed a very favorable taxpayer-financed stadium deal. Among other advantages, the ISFA paid 100 percent of the costs of building U.S. Cellular Field

and continues to pay for improvements. The White Sox also paid no rent for the first 18 years and currently pay only token rent. (*Id.* ¶14.) Reinsdorf is the principal owner of the Chicago White Sox and has been the chairman of the company that owns the White Sox since 1980. He also has substantial equity interests in the Chicago Bulls and the United Center. (*Id.* ¶¶ 2-3.)

Irmer was the Executive Director from December 2004 until her termination on April 25, 2011. (*Id.* ¶ 1.) As Executive Director, Irmer was responsible to "[d]irect and supervise the administrative affairs and activities of the Authority," to "[r]eport and make recommendations to the Authority on the merits and status of any proposed facility," and to "[p]erform any other duty that the Authority requires for carrying out the provisions of this Act." 70 ILCS § 3205/7. (*See also* Compl. Exh. 1 (Employment Agreement) § 1.1.) Irmer also served as the ISFA's "chief executive officer" and was responsible for managing it. (Compl. ¶ 10(c).) Irmer was paid $14,662.50 per month. (*Id.* Exh. 1 § 2.1.)

As the most senior employee, Irmer reported directly to its Board of Directors, including the Chairman. (*Id.* ¶ 10(c).) The Board is selected by the Mayor of Chicago and the Governor of Illinois. Although Irmer alleges that the Governor alone selects the Chairman, (*see id.* ¶ 10(b)), the Illinois statute provides that the Chairman "shall be appointed by the Governor subject to the approval of the Mayor of the City of Chicago . . ." . 70 ILCS § 3205/4. Thompson was the Governor of Illinois when ISFA was created and served as the Chairman of the Board from 2006 through 2011. (Compl. ¶ 3.)

Irmer alleges that "as a matter of law, each member of the ISFA Board . . . and the Executive Director, owe fiduciary duties to the State of Illinois and its citizens." (*Id.* ¶ 18.) "[T]hese fiduciary duties include the duty to act with the highest degree of loyalty and fidelity to the interests of the State and its citizens." (*Id.*) According to Irmer, "[t]hroughout her tenure

2

as . . . Executive Director/CEO . . . [Irmer] acted with the highest fidelity to the interests of Illinois taxpayers." (*Id.* ¶ 23(b).)

After becoming Executive Director, Irmer recognized that the ISFA was in a difficult financial condition, due in substantial part because it was putting the interests of the White Sox ahead of the interests of Illinois taxpayers. (*Id.* ¶ 21.) As a result, Irmer sought to reform the relationship between the White Sox and the ISFA established in the Management Agreement, which she viewed as abusive to taxpayers. (*Id.* ¶ 24.) To that end, Irmer developed and implemented a facilities management plan, resulting in millions of dollars of savings for ISFA. (*Id.* ¶ 25.) Irmer also sought to develop new sources of revenue from non-baseball events, such as music concerts. (*Id.* ¶ 28.) She advocated that the White Sox pay rent to the ISFA and also sought to develop the publically owned lands around Cellular Field to generate additional revenue. (*Id*. ¶¶ 30, 35.) The White Sox and Reinsdorf opposed these proposals because of the economic detriment to them. (*Id.* ¶¶ 29-30.) Reinsdorf also opposed the music concerts on the basis that they could detract from revenue generated by concerts held at the United Center. (*Id.*)

In 2008, with Irmer's strong support, the ISFA persuaded the White Sox, over its initial objections, to agree for the first time to begin paying rent, in the token amount of $1.2 million per year. (*Id.* ¶ 35.) Reinsdorf increasingly viewed Irmer as an opponent based on her reforms. (*Id.* ¶¶ 34, 36.) He also did not support her efforts to bring more members of minority communities into the ballpark because he viewed the White Sox brand as appealing primarily to people from the suburbs or other areas of the city perceived as having little contact with minorities. (*Id.* ¶ 37.) As a result, Reinsdorf lobbied former Governor Blagojevich or members of his staff to persuade them that Irmer's employment contract should not be renewed in December 2008. However, before Irmer could be terminated, Blagojevich was indicted and

arrested. Irmer's contract was not terminated and was extended through December 2010. (*Id.* ¶¶ 40-43.)

Irmer's conflicts with the White Sox continued as she persisted in her "efforts to protect and enhance the interests of Illinois taxpayers." (*Id.* ¶ 44.) In 2010, the White Sox proposed the development of a new restaurant on the north side of 35th Street, known as "Bacardi at the Park." (*Id.* ¶¶ 46-50.) Irmer strongly opposed the proposal as a one-sided benefit to the White Sox; the White Sox, and not the State of Illinois, would receive the rent and profit-sharing revenues generated by the restaurant. She repeatedly protested to the ISFA Board, to individual Board members and to the attorney for the ISFA that they should reject the Bacardi at the Park deal, based on her belief that "every ISFA Board member . . . had the legal duty to" reject the deal. (*Id.* ¶ 51.) However, the ISFA Board, led by Thompson, ignored Irmer's objections and approved the final Bacardi at the Park agreement in November 2010, giving away millions of dollars to the White Sox that could have gone to the State of Illinois. (*Id.* ¶ 52.)

Shortly thereafter, in January 2011, the ISFA Board voted to extend Irmer's written employment agreement only on a month-to-month basis instead of a one or two-year term. Around this same time, Irmer also opposed $7 million of a $10 million request by the White Sox for enhancements to U.S. Cellular Field. (*Id.* ¶¶ 57-58.)

In late 2010 and early 2011, Irmer decided to go beyond the ISFA Board and attempted to see Illinois Governor Patrick Quinn to tell him of the problems at the ISFA and to enlist his support for reform. (*Id.* ¶ 56.) However, Quinn's staff blocked her efforts, and while Thompson told Irmer he would arrange a meeting with Quinn, that meeting never happened. (*Id.* ¶ 56.) Blocked from seeing Quinn, Irmer met or spoke with other Illinois politicians and public officials in order to achieve "reform at ISFA". (*Id.* ¶ 59.) The people she met with included:

4

retired Illinois Senate President Emil Jones, who had been identified as being the likely nominee to be the next chairman of the ISFA Board; Manny Sanchez, an attorney who was in the process of being nominated to the ISFA Board; Joan Coogan, who was head of Inter-Governmental Affairs (IGA) under Mayor Daley; and members of Mayor-elect Emanuel's staff. (*Id.*) She made it clear in these meetings that Reinsdorf and the White Sox were exercising undue influence over Thompson and the ISFA Board and that the Illinois taxpayers were being seriously harmed. (*Id.* ¶¶ 59-60.)

In April 2011, Irmer scheduled a meeting with newly elected Mayor Emanuel to inform him of the problems at the ISFA. The meeting was set for April 28, 2011, and was known to her staff, including members who reported to Thompson. (*Id.* ¶ 61.) On April 25, 2011, Irmer arrived at the ISFA offices to find that she had been locked out of her office and Thompson waiting for her. Thompson told Irmer that the ISFA Board was holding a special meeting on April 27, 2011, to vote on her termination and gave her the choice of resigning or being fired. (*Id.* ¶ 62.) Irmer did not resign and was terminated by the ISFA Board on April 27, 2011. (*Id.* ¶ 63.)

After Irmer was terminated, the ISFA approved the White Sox request that Irmer had opposed. The ISFA also abandoned or curtailed its attempts to attract music concerts at U.S. Cellular Field. Irmer's other efforts, including increasing minority attendance and public access to White Sox games, also were no longer a priority. (*Id.* ¶¶ 64-67.)

## LEGAL STANDARD

Rule 12(b)(6) permits a defendant to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its

5

face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). Rather, the complaint must provide a defendant "with 'fair notice' of the claim and its basis." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (quoting Fed. R. Civ. P. 8(a)(2) and *Twombly*, 550 U.S. at 555). When ruling on a motion to dismiss under Rule 12(b)(6), the court accepts all well-pleaded factual allegations as true and construes all reasonable inferences in favor of the plaintiff. *Tamayo*, 526 F.3d at 1081.

## ANALYSIS

Irmer's Complaint contains the following claims: (1) Count I, asserted against Thompson, for infringement of Irmer's First Amendment right to free speech and retaliation; (2) Count II, asserted against Reinsdorf and Thompson, for conspiracy to violate Irmer's civil rights under 42 U.S.C. § 1983; and (3) Count III, asserted against Reinsdorf, for a state law claim of tortious interference with prospective economic advantage.

*Count I: First Amendment Retaliation*

Defendants first argue that Irmer has failed to state a claim for violation of her First Amendment rights on the basis that her alleged speech was not protected.[1] They next argue that Thompson is entitled to qualified immunity.

---

[1] Although Count I is asserted only against Thompson, Count II alleges that both Defendants conspired to deprive Irmer of her First Amendment rights. Consequently, Reinsdorf makes essentially the same argument as Thompson that Irmer has failed to state a First Amendment claim.

Protected Speech

Under the First Amendment, a public employee is protected from retaliation by his government employer for engaging in protected speech. *Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 376 (7th Cir. 2009). To state a First Amendment retaliation claim under § 1983, the employee must show: "(1) his speech was constitutionally protected; (2) the protected speech was a 'but-for' cause of the employer's action; and (3) he suffered a deprivation because of the employer's action." *Wackett v. City of Beaver Dam, Wis.*, 642 F.3d 578, 581 (7th Cir. 2011) (internal citations omitted). However, a public employee's speech is not protected if it is made pursuant to her official duties. *Garcetti v. Ceballos*, 547 U.S. 410, 426 (2006) ("We reject . . . the notion that the First Amendment shields from discipline the expressions employees make pursuant to their professional duties.")

In *Garcetti*, the plaintiff, a deputy district attorney, alleged that he was retaliated against at work in violation of the First Amendment, after he wrote a memorandum recommending a dismissal of a case based on government misconduct. *Id.* at 413-15. The Supreme Court rejected his claim, holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421.

The Seventh Circuit has recognized that *Garcetti* only bars retaliation claims "if the plaintiff spoke as an employee rather than as a citizen." *Abcarian v. McDonald*, 617 F.3d 931, 937 (7th Cir. 2010) (internal citations omitted). To determine whether a plaintiff spoke as an employee or as a citizen, the court "take[s] a practical view of the facts alleged in the complaint, looking to the employee's level of responsibility and the context in which the statements were made." *Id.* at 937 (citing *Tamayo*, 526 F.3d at 1092). "The controlling factor . . . is whether the

7

speech 'owes its existence to a public employee's professional responsibilities.'" *Callahan v. Fermon*, 526 F.3d 1040, 1044 (7th Cir. 2008) (quoting *Garcetti*, 547 U.S. at 421). "An employee with significant and comprehensive responsibility . . . certainly has greater responsibility to speak to a wider audience on behalf of the governmental unit." *Tamayo*, 526 F.3d at 1092; *see also Abcarian*, 617 F.3d at 937.

Defendants argue that Irmer's First Amendment claim should be dismissed because she was acting within the scope of her duties as Executive Director of the ISFA when she instituted reforms and protested against ISFA actions. Irmer responds that she was whistleblowing and acting outside of her official duties because she spoke out beyond the ISFA. She points to her meetings with politicians and public officials, as well as her attempts to meet with the Governor and Mayor.

"[W]hen determining whether a public employee spoke as a citizen, the operative question is whether he made his statements pursuant to his official duties." *Callahan*, 526 F.3d at 1044. Here, taking a "practical view" of her level of responsibility and context of which she made the alleged statements, Irmer has failed to allege that she was engaging in protected speech outside of her official duties. *See Abcarian*, 617 F.3d at 937. She alleges that she spoke with Jones, Sanchez, Coogan and members of Mayor-elect Emanuel's staff and told "each of these persons . . . that the interests of the Illinois taxpayers were being seriously harmed." (Compl. ¶¶ 59-60.) By her own allegations, her duties included protecting the interests of Illinois taxpayers. (*Id.* ¶ 18.)

Furthermore, Irmer alleges that she met with these "members of the Illinois political community" because they "would be in a position to impose reform upon ISFA." (*Id.* p. 4; *see also* ¶ 59.) Irmer was not speaking out in a public forum, such as writing letters to a newspaper;

8

rather, she targeted people connected to the Board, to whom she reported as Executive Director. Jones and Sanchez were going to be joining the Board, while Mayor-elect Emanuel would be participating in the appointment of Board members. (*Id.* p. 4, ¶¶ 10(b), 59.) Irmer also alleges that her speech to reform the ISFA ended when she was fired. (*Id*. p. 5, ¶ 67.) By her own allegations, it does not appear that Irmer "ever stepped outside [her position] to speak as a citizen." *Abcarian*, 617 F.3d at 937. Because "[a] mere speculative possibility" that she spoke as a citizen is insufficient, *id.*, Irmer has failed to state a claim that she was engaging in protected speech.

Moreover, Irmer has failed to make any plausible allegations that Thompson *knew* about her allegedly protected speech. To state a First Amendment retaliation claim, Irmer must connect her protected speech with her termination. *See Caldwell v. City of Elwood, Ind*., 959 F.2d 670, 672 (7th Cir. 1992) (dismissing claim where plaintiff failed to plead any defendant actually knew of the allegedly protected speech). Irmer has not done so. Relatedly, Irmer has not sufficiently alleged that her protected speech was the proximate cause of termination. *See Wackett*, 642 F.3d at 581. Thompson, as a matter of Illinois law, lacked the power to terminate her; rather, a decision to terminate Irmer required a majority vote of the ISFA Board. *See* 70 ILCS § 3205/6. Irmer has not alleged that the majority of the ISFA Board terminated her based on her protected speech. Count I is dismissed without prejudice.

### Qualified Immunity

Additionally, Defendants argue that Thompson is entitled to qualified immunity as a public official. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223,

9

231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is an affirmative defense, and the federal standard of notice pleading does not require plaintiffs to anticipate defenses in their pleadings. *Jacobs v. City of Chicago*, 215 F.3d 758, 765 n. 3 (7th Cir. 2000). However, a plaintiff can plead herself out of court by alleging, and therefore admitting, the elements of the defense. *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012).

Irmer has alleged that Thompson was a public figure acting under color of state law. (Compl. ¶ 76.) As such, he is presumptively entitled to qualified immunity unless he violated Irmer's clearly established constitutional rights of which a reasonable official would have known. As discussed above, Irmer has failed to allege that her Constitutional right to free speech was violated. For this additional reason, Count I is dismissed without prejudice.

*Count II: Conspiracy*

A claim of civil conspiracy under 42 U.S.C. § 1983 requires a plaintiff to allege she "was deprived of a right secured by the Constitution or laws of the United States and that the deprivation was caused by a person acting under color of state law." *Kelley v. Myler,* 149 F.3d 641, 648 (7th Cir. 1998) (citing *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155-156 (1978)). Once that has been established, the plaintiff must also allege the co-conspirators: (1) "reached an understanding to deprive the plaintiff of his constitutional rights" and (2) "were willful participants in joint activity with the State or its agents." *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003) (internal quotations and citations omitted).

As discussed above, Irmer has failed to sufficiently allege that she was deprived of her First Amendment right to free speech. This is sufficient by itself to dismiss her conspiracy claim. *See Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008) ("[C]onspiracy is not an independent basis of liability in § 1983 actions.").

Moreover, Irmer's Complaint is devoid of any facts that would establish an agreement between Thompson and Reinsdorf to deprive Irmer of her constitutional rights. The existence of such an agreement is essential to a conspiracy claim. *See Redwood v. Dobson*, 476 F.3d 462, 466 (7th Cir.2007) ("The minimum ingredient of a conspiracy . . . is an agreement to commit some future unlawful act in pursuit of a joint objective."); *see also Lucky Fella LLC v. Vill. of Oak Brook*, 11 C 08936, 2013 WL 1337316, at *3 (N.D. Ill. Mar. 29, 2013) (dismissing conspiracy claim where plaintiff failed to allege any facts "that plausibly suggest any kind of coordination or agreement between [defendants] - the hallmark of a conspiracy").

Faced with the lack of facts, Irmer argues in her Response Brief that her conspiratorial agreement "is plausible" because Reinsdorf and Thompson "had an established course of dealings with respect to Cellular Field" and shared the "same motivation" to silence Irmer. (Pl.'s Resp. Br. at 11.) This is insufficient to establish an agreement between Reinsdorf and Thompson.

Furthermore, Irmer's conspiracy claim against Reinsdorf is barred by the *Noerr-Pennington* doctrine, which provides private citizens with immunity from civil liability for petitioning the government for official action in their favor, even if the results might harm others. *See Tarpley v. Keistler*, 188 F.3d 788, 794 (7th Cir. 1999). Here, Irmer alleges only that Reinsdorf petitioned government officials to remove her, in order to achieve economic benefits for the White Sox and himself. This alleged conduct is protected by the *Noerr-Pennington* doctrine. Count II is dismissed without prejudice.

*Count III: State Claim*

In Count III, Irmer alleges that, under her written employment agreement with the ISFA, she had a reasonable expectation of prospective economic advantage through her continued

employment as the Executive Director of the ISFA. Irmer alleges that Reinsdorf tortiously interfered with her continued employment, causing her termination. Reinsdorf argues, *inter alia*, that this Count should be dismissed because under Irmer's employment contract, ISFA had a right to terminate her for convenience at any time in exchange for six months of severance pay. Reinsdorf has attached to his Motion as exhibits: (1) Irmer's January 1, 2011 employment agreement and (2) the ISFA Resolution, reflecting the ISFA's April 27, 2011 vote to terminate Irmer's employment agreement for convenience.

As a preliminary matter, Irmer has moved to strike the exhibits from Reinsdorf's Motion as improperly submitted. While the court generally will not go outside of the complaint on a motion to dismiss, Fed. R. Civ. P. 10(c) provides that any document adopted by reference in the pleadings may be considered as part of the pleadings. Furthermore, "documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss." *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002) (quoting *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994)). This exception is especially applicable in cases interpreting a contract. *Rosenblum*, 299 F.3d at 661 (citing *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998). In her Complaint, Irmer has specifically referenced her employment agreement, as well as the ISFA Board's vote to terminate that employment. (*See* Compl. ¶¶ 54, 63, 74, 89.) Consequently, Irmer's Motion to Strike is denied, and the exhibits are properly considered.

Under Illinois law, a plaintiff asserting a claim for tortious interference with a prospective economic advantage must allege: (1) a reasonable expectation of entering into a valid business relationship; (2) the defendant had knowledge of that expectation; (3) defendant's intentional and

12

unjustified interference caused a breach or termination of that expectation; and (4) damages. *Ali v. Shaw*, 481 F.3d 942, 944 (7th Cir. 2007) (citing *Fellhauer v. Geneva*, 568 N.E.2d 870, 877–78 (Ill. 1991)). "An action for prospective economic advantage cannot be maintained upon the breach of an existing contract." *Delphi Indus., Inc. v. Stroh Brewery Co.*, 945 F.2d 215, 218 (7th Cir. 1991) (internal citations omitted). Likewise, "[a]n existing agreement precludes an action for intentional interference with prospective economic advantage." *Id.* at 221. Irmer alleges that she was employed by the ISFA pursuant to a written employment agreement, (Compl. ¶ 89), and as such, cannot state a claim for tortious interference with prospective economic advantage.

Furthermore, Irmer has not alleged sufficient facts to establish that Reinsdorf intentionally interfered with her employment so as to cause her termination. Although she alleges that Reinsdorf lobbied to remove her in 2008, she states that her contract was renewed at that time through 2010. Irmer has not alleged that Reinsdorf had any communications with any ISFA Board members or otherwise caused her termination in 2011. Because Irmer has failed to state a claim, Count III is dismissed.

## CONCLUSION

For the reasons set forth above, Defendant Thompson's Motion to Dismiss Counts I and II [15] is granted. Defendant Reinsdorf Motion to Dismiss Counts II and III [19] is granted. Plaintiff Irmer's Motion to Strike [24] is denied. Irmer is granted leave to amend her claims, if she can do so pursuant to Rule 11, within thirty days of this Order.

Date:   June 19, 2014

_____
JOHN W. DARRAH
United States District Court Judge